IN THE

## SUPREME COURT

OF

### PENNSYLVANIA.

Lancaster District, May Term, 1810.

Lessee of BURKART and WILLIS *against* BUCHER
and another.

THIS was an appeal from the decision of the late Mr.
Justice *Smith*, at a Circuit Court for *York.*

The cause was tried twice; first, before the Chief Justice
in *May* 1807, when a verdict was found for the defendants,
contrary to his charge, and a new trial was ordered; and a
second time before Judge *Smith* in *May* 1808.

*The testator, after beginning his will " as " touching such " worldly estate " &c," devised to his son W. seventy acres of land, and concluded the devise with these*
words, "if the said *W.* should chance to die without heir or issue, the above said lands
" must *fall into the possession* of his brother *R.*" He then devised certain chattels to *W.* and
ordered him to pay 40*l.* to his sister, in four annual instalments; after which, he devised
the remainder of his plantation to his son *R.* in the same manner as he had devised to *W.*
—*W.* took an estate tail, with a contingent remainder to *R.* upon the event of *W's.* dying
without issue in the lifetime of *R.*

Where the payment of a sum in gross, is annexed to a devise of land in general terms
without expressing any estate, the devisee takes a fee. But where the estate of the devisee
is plainly indicated, a direction to make such a payment has no effect to alter his estate.

A warrant and survey with payment of the purchase money, is to be considered in *Penn-
sylvania* in the same light as the legal estate in *England*, and is not to be distinguished, as
to conveying, intailing, and barring intails, from estates strictly legal.

The purchaser under a patent from the commonwealth, is bound to take notice of the
title recited in the patent, and is affected with notice of what appears on that title, al-
though it is contrary to the patent.

VOL. II.                                            3 M

By the judge's notes the case was this.—The land in question was surveyed in 1737, under a license by *Blunston* to a certain *David Priest*, to whom a warrant of acceptance issued in 1744 for 400 acres. The purchase money was paid to the proprietaries. In 1747, the widow and heir of *Priest* sold two hundred acres to *Henry Willis*, who, on the 13th of *August* 1764, made his will, under which the principal point in the case arose.

The testator began his will, " *as touching such worldly* " *estate wherewith it has pleased God to bless me in this life*, " I give, devise, and dispose of the same in the following " manner and form." He then made certain bequests to his wife, after which came the following devise. " Also, I give " to my beloved son *William Willis*, seventy acres of land " fronting on *Susquehanna* river, to be taken off the planta- " tion I now liveth on," (the tract bought from *Priest's* representatives,) " with the gristmill and sawmill, and all " the improvements that may happen in said seventy acres " of land, to be divided with a straight line from the creek " called *Yellow Breeches*, to the ferry land line. Also ten " acres of meadow ground adjoining on the southeast side " of the old meadow, and so extending towards the marsh. " If the said *William Willis* should chance to die *without* " *heir or issue*, the above said lands *must fall into the pos-* " *session* of his brother *Richard Willis*. N. B. That *Richard* " is left in the care of his brother *William*, till he come to " age. I leave the horses and cattle to *William*, but he must " give *Richard* his share of them, when *Richard* comes to " age."

The testator then gave his daughter *Mary* forty pounds, to be paid by his son *William*, ten pounds when she should arrive at lawful age, and ten pounds *per annum* afterwards until the whole should be paid. He gave a legacy of the same amount to his daughter *Catharine*, to be paid by his son *Richard*, ten pounds when he should arrive at lawful age, and ten pounds per annum afterwards until the whole should be paid.

He then concluded his will with the following devise. " *Also* I give to my beloved son *Richard Willis* the whole " *remainder of my plantation*, with the old dwellinghouse

" and barn, and the old orchard and meadow, and all the
" improvements that may happen in his part or division of
" the abovesaid premises. And if the abovesaid *Richard*
" should chance to die *without heir or issue*, the abovesaid
" lands and effects *shall fall into the possession of my son*
" *William Willis*, BY THEM *freely to be possessed and enjoyed.*"

The will was proved on the 26th of *March* 1765, and re-
corded in the register's office for *York* county.

On the 24th of *April* 1778, *William Willis* the devisee had
issue his first son *Henry Willis*, one of the lessors of the
plaintiff.

On the 18th of *November* 1783, *William* obtained a patent
for the eighty acres devised by his father, (the premises in
the ejectment) which granted the land to the patentee *in fee-
simple*, reciting that the title was derived under the will of
*Henry Willis*.

In *June* 1794 he sold a part of the land for 1000*l.*, which
he conveyed in fee by deed of bargain and sale, reciting the
patent; and in *April* 1796 he sold the residue for 900*l.*,
which he also conveyed by bargain and sale with the same
recital.

Upon the part first conveyed, valuable improvements
were made by the purchaser in the lifetime of *William Willis;*
and it was sold publicly by the sheriff in *October* 1799, and
again at private sale in the year 1800 to *Bucher* one of the
defendants, having been previously advertised in the public
papers and in handbills.

*William Willis* died in the autumn of 1799.

During the time when these improvements were made,
and at the time of the sheriff's sale and the sale to *Bucher,*
*Henry Willis* the younger lived within a mile or two of the pre-
mises, and never gave notice of his claim; but it did not ap-
pear that he was then cognisant of his title. He told a witness
after his father's death, that he thought he had received from
his father about thirty dollars of the money; but whether he
knew it to be a part of the purchase money at the time was
doubtful. He took the benefit of the insolvent laws shortly
before his father's death, and made return that he was not
entitled to any real estate; at the same time he assigned for
the benefit of his creditors, all his property in possession

and in expectancy to two persons, of whom *Burkart*, the other lessor of the plaintiff was the survivor; but his debts amounted only to 8*l.* 19*s.* 7*d.* and the property in question was worth 10,000 dollars.

The questions were three. 1. Whether *William Willis* took an estate-tail under the will of his father. 2. If he did, then whether it was any thing more than an estate-tail in an equity, which might be barred by deed of bargain and sale. 3. Whether, supposing it to be a legal estate-tail, *Henry Willis* was not barred by the concealment of his claim; or whether the purchasers were to be affected with notice of it, by any thing appearing on the title papers.

The first point was reserved. Upon the second his Honour was of opinion, that if *William Willis* took an estate-tail, it was not barred by his conveyance. The third point, as to the acts and omissions of *Henry Willis*, he left to the jury as a fact; and as to notice of the estate-tail from the title papers, he was of opinion that, the patent being always received as *prima facie* evidence of title, and the person claiming under it not being obliged to produce the prior title, he was not bound to go further back than the patent, by which the estate was recited to have vested in *William Willis* in fee; and therefore he was not to be affected with implied notice by the earlier papers.

The jury found for the defendants; and a new trial being refused, the plaintiff appealed from that decision.

*C. Smith* and *Duncan* argued for the plaintiff, and in favour of a new trial.

1. Upon the first point, they contended that *William Willis* took an estate-tail. They said, that if a limitation can by any possibility be construed to be a remainder, it shall not be construed an executory devise; and if *Richard* should be considered as taking by way of remainder, then *William* took but an estate-tail; so that the leaning was in favour of the intail. The land is given to *William* generally, with a provision that in case he shall die without heir or issue, then it shall fall into the possession of *Richard.* Heir means the same as issue, because *William* could never die without an heir, while *Richard* was alive; so that the devise is the same as to a man, and if he dies without issue then to another,

which is a clear estate-tail by implication. The testator shews an intent to provide for the issue, which can be done only by giving an estate-tail; and it therefore may well be held that he has given it by implication, with a contingent remainder to *Richard*, to take effect upon the event of *William's* dying without issue in the lifetime of *Richard. Denn* v. *Shenton* (a). *Goodright* v. *Goodridge* (b). *Nottingham* v. *Jennings* (c). The direction to pay 40l. to his sister, has no effect, for two reasons. It is not annexed to the devise of the land, but follows a devise of chattels amply sufficient to pay it. And if it were annexed, such a direction has never been held to give the fee, where either in express terms, or by necessary implication as here, the devisee took a less estate. In *Denn* v. *Shenton* such a payment was charged upon the devisee of an estate-tail, and it was not urged even as an argument in favour of a fee-simple.

2. *Henry Willis* the testator was seised of an intailable estate. A survey under a license by *Blunston*, which has always been held as good as a warrant, and the payment of the purchase-money to the proprietaries, give a legal estate. The proprietaries have never been considered as trustees. If they had been, every patentee would hold the land against older rights of which he had no notice; a doctrine that was never asserted in Pennsylvania. Women are dowable of such estates. They pass by the same conveyances as legal estates do in England. They are subject to the same modifications, and are protected by the same remedies. They are therefore intailable within the statute *de donis. Lessee of Sims* v. *Irvine*(d). The deed of *William Willis* of consequence did not bar the issue in tail.

3. The acts or omissions of *Henry Willis* had no effect: first, because he was a minor at the time of the sale and improvements, and was under the control of his father the tenant in tail; secondly, because he had no immediate interest; and thirdly, because there was not a shadow of evidence to shew that he was acquainted with his remote interest. It is perfectly clear that ignorance of title excuses the party

(a) *Cowp.* 410.　　　　　(c) 1 *P. Wms.* 23.
(b) *Willes* 369.　　　　　(d) 3 *Dall.* 425.

1810.

Lessee
of
WILLIS
*v.*
BUCHER.

from giving notice. 1 *Fonbl.* 151. 1 *P. Wms.* 394 *note. Dyer* v. *Dyer (a).* But it is immaterial whether *Henry Willis* was ignorant of his title or not. The defendants had notice that they held under a tenant in tail, and notice by the issue was unnecessary. They had notice because their deeds recited the patent, and the patent recited the will which was upon record. Where a purchaser cannot make out a title, but by a deed which leads him to another fact, he is not a purchaser without notice of that fact, but is presumed to be cognisant of it. Whatever is sufficient to put him upon inquiry is good notice. *Dunch* v. *Kent (b).* *Drapers' Company* v. *Yardly (c).* *Moor* v. *Bennett (d),* *Biscoe* v. *The Earl of Banbury (e),* *Smith* v. *Low (f),* 2 *Fonbl.* 155. 2 *Pow. on Mort.* 571. The judge therefore misdirected the jury in telling them that the purchasers were not bound to look beyond the patent. They were bound to go from one deed to another up to the license or warrant, and are presumed to have knowledge of every thing appearing upon the papers throughout. Upon this ground we are entitled to a new trial notwithstanding the two verdicts.

As to the hardship upon the purchasers, it is of no consequence. Payment of a full consideration to the tenant in tail is nothing. Even if he covenants to levy a fine, and dies while he is in prison under an attachment from Chancery for not doing it, the issue are not bound. *Fox* v. *Crane (g).*

*Bowie* and *Hopkins* for the defendants.

1. *William Willis* took a fee with an executory devise to *Richard.* There are many reasons for supposing that the testator intended to give a fee. First, there are the introductory words, shewing an intent to dispose of his whole interest. Secondly, there is no residuary clause, which shews that it was all disposed of in the first instance. Thirdly, there is a gross sum of 40*l.* to be paid by *William,* which if it was an estate-tail might make him the loser. If it were an express estate-tail, this reason, it is true, would have no weight; but it is

| | | |
|---|---|---|
| (a) 2 *Cha. Ca.* 108. | (d) 2 *Cha. Ca.* 246. | (f) 1 *Atk.* 490. |
| (b) 1 *Vern.* 319. | (e) 1 *Cha. Ca.* 287. | (g) 2 *Vern.* 306. |
| (c) 2 *Vern.* 662. | | |

contended for only by implication, which makes the case different. Fourthly, he gives the whole *remainder of his plantation* to *Richard*, which implies that he had before given a part of his plantation to *William;* and the term plantation passes a fee. *Gulliver* v. *Poyntz* (*a*), *Wellock* v. *Hammond* (*b*), *Read* v. *Hatton* (*c*), *Frogmorton* v. *Holyday* (*d*). But what clearly proves that a fee, with an executory devise over was intended, is, that the devise over was to take effect, if ever, during *Richard's* life; it was *to fall into his possession;* which, at the same time that it brings the devise within the proper limits of a life in being, shews that the testator did not contemplate *Richard's* taking after the expiration of the estate-tail by the indefinite failure of *William's* issue. *Pells* v. *Brown* (*e*), *Wealthy* v. *Bosville* (*f*), *Fosdick* v. *Cornell* (*g*), *Jackson* v. *Blanshan* (*h*).

2. If the devise to *William* was an estate-tail, it was but an equitable estate, and the issue were barred by his conveyance. The land was not patented at the time of *Henry Willis's* death. He had but an equity in it, the proprietaries still holding the legal estate in trust for him. It is true that in *Pennsylvania*, to prevent a failure of justice, the *cestuy que trust* is permitted to use a legal remedy, as to recover possession by ejectment and the like; but the distinction between legal and equitable estates, in all cases, except where if set up, it will, from the want of a court of Chancery, annihilate the equity, is as well established here as in *England*. It is of the utmost importance to the systems of law and equity, that this distinction should be maintained, and that their principles should be blended as little as possible. A warrant and survey, with the payment of the purchase money, give a title sufficient to maintain an ejectment; but that they give a legal title is a very different question. It was not so decided in *The Lessee of Sims* v. *Irvine*, because there the compact between *Pennsylvania* and *Virginia* was as complete a confirmation of the equitable title as a patent; and it is observable, that the question of remedy in that case

(*a*) 3 *Wils.* 143.
(*b*) *Cro. Eliz.* 204.
(*c*) 2 *Mod.* 25.
(*d*) 3 *Burr.* 1623.

(*e*) *Cro. Jac.* 590.
(*f*) *Cas. Temp. Hardw.* 245.
(*g*) 1 *Johnson* 440.
(*h*) 3 *Johnson* 292.

turned upon this fact. The true rule is, that they are equivalent to the legal estate, in all cases where it is essential to the existence of the equity that they should be so; but it is not essential that they should be so for the purpose of being intailable within the statute *de donis*, or for the purpose of requiring a common recovery to bar the intail. An intail of a trust is not within the statute. The author of the *Treatise of Equity* says it may be aliened by *any manner of conveyance;* 1 *Fonbl.* 293; and although this may be too extensive a position, yet that it may be aliened by a feoffment or bargain and sale, without the consent of the trustee or remainderman, is held in many cases. *North* v. *Champernon* (*a*), *Carpenter* v. *Carpenter* (*b*), *Beverly* v. *Beverly* (*c*), *North* v. *Way* (*d*).

3. The acts and omissions of *Henry Willis* were left to the jury upon the question of fraud, of which they were exclusively the judges. He lived near the land all his life, and he saw the improvements. Even while an infant, his concealment of title would affect him; but he was of full age when the property was sold publicly by the sheriff, and he received from his father a part of the purchase-money. If he knew his rights he is barred. 1 *Eq. Abr.* 256. *Hunsden* v. *Cheyney* (*e*), *Raw* v. *Pole* (*f*), *Franklin* v. *Thornbury* (*g*), *Savage* v. *Foster* (*h*), *Goodright* v. *Straphan* (*i*). Whether he knew them was also a question for the jury, which they have decided against him. The court will not overthrow the opinion of two juries upon these facts. The question of notice from the title papers, ought not to be settled by the rules adopted in *England*. Conveyancing there is a distinct science, cultivated by learned men, whose counsel is always resorted to. Rules devised for such a state of things, apply with great hardship to the interior of our state, where conveyances are rarely taken upon professional advice. But there is another reason for not implying notice of any thing in the papers beyond the patent. The title emanates from the proprietaries. The patent is their solemn confirmation, which is enough in the first instance to rely upon. It is given upon an examination of the prior conveyances at the land-office; and what it states

(*a*) 2 *Cha. Ca.* 64.          (*d*) 1 *Vern.* 13.          (*g*) 1 *Vern.* 132.
(*b*) 1 *Vern.* 440.          (*e*) 2 *Vern.* 150.          (*h*) 9 *Mod.* 35.
(*c*) 2 *Vern.* 131.          (*f*) 2 *Vern.* 239.          (*i*) *Cowp.* 201.

is so far to be deemed the legal result, as not to leave the party open to the presumption of notice of what is contrary to it in the prior papers.

This is undoubtedly a hard demand. There have been two verdicts against it; and if any mistake has been made in point of law, it has not been against the honesty and equity of the cause. It is therefore not a proper case for a new trial. *Deerly* v. *Dutchess of Mazarine* (a), *Smith* v. *Page* (b), *Dunkly* v. *Wade* (c), *Farewell* v. *Chaffey* (d). After a discontinuance, the issue in tail are never assisted in Chancery. *Kelley* v. *Berry* (e), *Bunce* v. *Phillips* (f).

TILGHMAN C. J. The first question in this case is, what estate passed to *William Willis*, by the will of his father *Henry Willis?*

The testator having declared his intention to dispose of the whole of his estate in the beginning of his will, devised to his son *William* in the words following. (Here the Chief Justice read the devise to *William*.) After this, follow several devises and bequests, among which is one by which part of the personal estate is given to the said *William*. A legacy of 40*l.* is then given to the testator's daughter *Mary*, to be paid by the said *William* by instalments. The remainder of the land is then given to his son *Richard* in the following terms. (The Chief Justice then read the devise to *Richard.*)

If the devise to *William* is abstracted from the rest of the will, it must be considered as an estate-tail by direct and necessary implication. There are no words of limitation annexed to the gift to him, nor is it expressed to be for his life, nor is there any express devise to his *issue;* but the estate is not to go over to *Richard*, unless *William* should die without issue. Here is a plain intent to provide for the issue, which can no otherwise be effected than by vesting an estate-tail in their father. But there is not the least intimation of an intent to give a fee-simple. Failing issue of *William*, the land is to go to *Richard*.

It is contended however on the part of the *defendants*, that by considering this devise to *William* in connexion

(a) 2 *Salk.* 646.      (c) 2 *Salk.* 653.      (e) 2 *Vern.* 35.
(b) 2 *Salk.* 644.      (d) 1 *Burr.* 54.      (f) 2 *Vern.* 50.

with other parts of the will, it will appear that a fee-simple was intended for him, with an executory devise to *Richard*, to take effect on the contingency of *William's* dying without issue, in the life of *Richard*. The parts relied on, to shew this intent to give a fee-simple, are the introductory words of the will, expressing a design to dispose of the whole estate, and the legacy of 40*l.* to be paid by *William.* These introductory words have been more or less regarded by different judges. I will not say, that they are not to carry some weight in doubtful cases; but I am not disposed to allow them much consequence, where it is pretty clear from the other parts of the will, that an estate less than a fee-simple is intended; because, I believe, that in most cases the testator has a general intent to dispose of his whole estate, whether he says so in the beginning of his will or not. If however this intent of disposing of the whole estate is to have any effect, it will be best applied to the devise over to *Richard*, in case of *William's* death without issue; for in such case, it is to be supposed that the testator intended to give a fee. This supposition is strengthened by adverting to the devise of the remainder of his plantation to *Richard*, and if he should chance to die without issue, then to fall into the possession of *William*, *by them freely to be possessed and enjoyed.* These expressions, " freely to be possessed and " enjoyed," shew a strong intent to give a fee, and have been adjudged sufficient to convey it. It may be concluded then, that in the devise over, in both instances, the testator meant to give a fee. As to the payment of 40*l.*, if it had been annexed to the devise to *William*, and if there had been no expression in the devise to *William*, shewing an intent to give an estate-tail, then indeed, under the authority of adjudged cases which have been cited, and from the reason of the thing, independent of authorities, *William* would by virtue of that payment have taken an estate in fee-simple; because it is presumed, that by every devise it is intended to confer a benefit on the devisee; and it might happen that the payment of a sum of money might be an injury instead of a benefit, if the devisee took an estate less than a fee. But although this argument is satisfactory, where a devise is made in general terms without expressing any estate, yet it has

no weight in cases where the estate of the devisee is plainly indicated; because the devisee has no right to claim a greater estate than the testator intended for him, and if he dislikes the conditions, he may refuse the devise. Besides, the payment of 40*l.* is not annexed to the devise of land to *William;* but between the devise of the land and the direction to pay the money, a bequest of personal property to *William* intervenes, so that we cannot say that the testator ordered *William* to pay the money in consideration of the devise of the land. Much stress was laid by the defendants' counsel on these expressions—" the above lands must fall into the possession " of his brother *Richard.*" From hence they inferred, that the estate given to *Richard* was to take effect on a contingency to happen *during his life,* and not after an indefinite failure of issue of *William.* Without deciding on the accuracy of this construction, it is sufficient to remark, that supposing it to be just, it by no means follows that *William* was to take an estate in fee. It is quite consistent that *William* should take in *tail,* with a contingent remainder to *Richard,* to take effect on *William's* dying without issue in the life of *Richard.* Considering this will in all its parts, I am of opinion that *William* took an estate-tail in the land devised to him.

2. The next question is, has this estate-tail been barred? The defendants say it has, although no common recovery was suffered; because *Henry Willis,* whose will is dated in the year 1764, was not seized of a *legal* estate, but only an equitable one, the legal estate not having been at that time granted by the proprietaries of *Pennsylvania.* Cases were cited to prove that the statute *de donis* does not extend to equitable estates; and that in such cases the issue are barred by the deed of their ancestor without common recovery. I think it unnecessary to consider those cases, because in this state a warrant and survey, attended with the payment of the purchase-money, (which was the case here) is to be considered in the same light as the legal estate in *England.* We have no Court of Chancery to compel a specific performance of contracts, so that we have been in the habit of considering that as done, which Chancery would compel to be done. It has always been supposed that estates of this kind are not to

be distinguished as to the mode of conveying them, from estates strictly legal. This was the opinion of the learned and respectable judge, before whom this cause was tried in the Circuit Court, and I fully agree with him.

3. I will now consider the third point in this cause. It was strongly urged in the Circuit Court, that supposing the estate-tail not to have been barred, the *plaintiff* ought not to recover, because he had assented to the sale made by his father, and had given no notice of his title to the *defendants*, who are purchasers for a valuable consideration without notice. On the other hand, it was contended on the part of the plaintiff, that the defendants could not be considered as purchasers without notice, because they claim under a deed, which recites the patent to *William Willis*, and the patent refers to the will of old *Henry Willis*, by which the estate-tail is created. The learned judge who tried the cause was of opinion, that the purchasers were not bound to look further back than the patent, and no doubt this opinion must have had great weight with the jury. This is a principle of very great importance, considering the vast mass of property which is held without patent in this commonwealth. It may have very extensive and alarming consequences, if every purchaser from a patentee is to be considered as having no notice, and not bound to take notice of any thing prior to the patent. In cases like the present, where the prior title is referred to in the patent, there is no reason why the purchaser should not take notice of it. The will of *Henry Willis* was *recorded*, and it was the fault of the purchasers not to examine it. Why should the son of *William Willis* be barred of his estate, because the purchasers under his father neglected to look into a will to which their title deeds referred them? The cases cited for the plaintiff prove, and indeed the defendants' counsel do not deny, that by the principles of the common law, the purchaser in such cases is bound to take notice; but they say that those principles ought not to be extended here, because in this country the business of conveyancing is transacted by ignorant people. I cannot give my assent to this argument. If admitted in this case, it will be urged in every other, till at length all principles will be

prostrated under the plea of ignorance. It appears to me, that on this point the jury were misdirected in point of law.

4. The last question is, whether under these circumstances a new trial should be granted? Against a new trial it is urged, that this is a *hard* case, in which there have been two verdicts for the defendants. I perceive that it is a hard case, and I am extremely sorry for it. It is always hard on a man, who has the misfortune to purchase a bad title. But I must not suffer my feelings for the defendants to carry me so far as to do injustice to the plaintiff. If the cause had gone to the jury, in the manner which I conceive it ought by law to have been submitted to them, I should have been against a new trial. It must be a very extraordinary case indeed, in which I could be induced to give my opinion for a new trial, after two verdicts on matters of fact. But that is not the present case. I can have no assurance that the jury would have found the same verdict, under a different direction as to the point of law which has been mentioned. I must therefore, with reluctance, give my opinion, that this court cannot without injustice refuse the plaintiff a new trial.

YEATES J. concurred with the chief justice upon all the points.

BRACKENRIDGE J. was of the same opinion.

New trial granted.